UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
JAE LONDON,                                        :

                            Plaintiff,             :          REPORT AND
                                                              RECOMMENDATION
          -v.-                                     :
                                                              13 Civ. 6723 (PAC) (GWG)
NYS DEPARTMENT OF HOMELESS                         :
SERVICES, et al.,
                                                   :

                            Defendants.            :
-------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

        Plaintiff Jae London brings this action, pro se, pursuant to Title VII of the Civil Rights

Act ("Title VII"), 42 U.S.C. §§ 2000e et seq., alleging that defendants New York City

Department of Homeless Services ("DHS")[1] and Sonya Williams subjected him to a hostile work

environment, discriminated against him on the basis of gender, and retaliated against him for

engaging in protected activities.  Defendants have moved to dismiss London's complaint

pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.[2]  For the following reasons,

defendants' motion should be granted.

_____

        [1] While London refers to defendant as the "NYS Department of Homeless Services" in
his complaint, see Complaint, filed Sept. 20, 2013 (Docket # 2) ("Compl."), it is apparent that he
is in fact referring to the New York City Department of Homeless Services.

        [2]  Defendants have also purported to move in the alternative for summary judgment
pursuant to Fed. R. Civ. P. 56.  However, defendants' counsel has failed to file a Statement of
Material Facts as required by Local Civil Rule 56.1.  Notably, the Court had specifically directed
counsel to include such a statement with her motion papers.  See Memo Endorsement, filed Feb.
7, 2014 (Docket # 19) ("[T]he defendants shall file a Local Civil Rule 56.1 statement so that
plaintiff knows what facts (other than those alleged in the complaint) are at issue.").

I.      BACKGROUND

A.      Facts Alleged by London

For purposes of deciding defendants' motion to dismiss, the Court assumes the allegations in London's complaint are true and draws all reasonable inferences from those facts in London's favor.  See, e.g. Steginsky v. Xcelera Inc., 741 F.3d 365, 368 (2d Cir. 2014). Furthermore, in light of London's pro se status, the Court has in some instances considered factual allegations contained in his memoranda submitted in opposition to the defendants' motion where they amplify claims made in the complaint.[3]  See, e.g., Woods v. Goord, 2002 WL 731691, at *1 n.2 (S.D.N.Y. Apr. 23, 2002) (considering pro se prisoner's factual allegations in papers opposing motion to dismiss as supplementing complaint); Burgess v. Goord, 1999 WL 33458, at *1 n.1 (S.D.N.Y. Jan. 26, 1999) ("In general, 'a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss.  However, the mandate to read the papers of pro se litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum.'") (quoting Gadson v. Goord, 1997 WL 714878, at *1 n.2 (S.D.N.Y. Nov. 17, 1997)) (additional citations omitted).

Additionally, the Court has drawn relevant factual allegations from the various documents London has attached to his complaint because Fed. R. Civ. P. 10(c) provides that "the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference."  Cortec Indus., Inc. v. Sum Holding

_____

[3] In response to defendants' motion to dismiss, London has sent the Court four letters which we have construed as London's opposition memoranda.  See First London Letter, dated Mar. 3, 2014 (Docket # 24) ("Opp. 1"); Second London Letter, dated Mar. 10, 2014 (Docket # 25) ("Opp. 2"); Third London Letter, dated Apr. 23, 2014 (Docket # 27) ("Opp. 3"); Fourth London Letter, dated July 14, 2014 (Docket ## 28, 29) ("Opp. 4").

L.P., 949 F.2d 42, 47 (2d Cir. 1991) (citation omitted); accord Hirsch v. Arthur Andersen & Co., 72 F.3d 1085, 1092 (2d Cir. 1995) ("We may consider all papers and exhibits appended to the complaint, as well as any matters of which judicial notice may be taken."); Ocasio v. Riverbay Corp., 2007 WL 1771770, at *4 (S.D.N.Y. June 19, 2007) (same).

In January 2013, London had been working as the building manager of the Washington Hotel (the "Hotel") for more than thirteen years.  See September 10, 2013 Jae London Letter (annexed to Compl.) ("Sept. 2013 Letter"), at 1.[4]  London's employer was Alan Lapes, the owner of the Washington Hotel.  See January 2013 Complaint Against Sonya Williams (annexed to Compl.) ("Jan. 2013 Letter"), at 5; February 2013 Jae London Letter (annexed to Compl.) ("Feb. 2013 Letter"), at 9.  Because the Hotel provided rooms to "homeless clients" on a daily basis, DHS employees regularly inspected the Hotel to ensure that its rooms met certain quality standards.  See Jan. 2013 Letter at 6-7.  In London's words, "[t]he purpose of [the DHS employees'] visits was to make an evaluation of the Washington, prepare a report for the [DHS] so that Alan Lapes [would] address any issue."  Id.  Additionally, London has explained in a letter to the Court that, with regard to any "priority issue" involving homeless clients, London was supposed to report the issue to DHS first.[5]  See Opp. 1 at 1.  In the same letter, however, London acknowledges that, in practice, "he did not notify DHS of every issue at the Hotel because [his employer] Lapes had instructed him not to do so."  Id. at 5.

_____

[4] Because the documents attached to the complaint are not separately paginated, the Court cites to the ECF page numbers.

[5] According to London, "D.H.S. takes over the role as the 'Superior'" in the provision of shelter to the homeless, meaning that all "situations" involving a client must be reported to DHS, which "will label the situation as a 'Priority One, Two or Three."  Opp. 1 at 1.  A DHS document entitled "Procedures for Priority 1 Incident Reporting" states that "[a]ny and all Priority incidents must be reported to DHS immediately."  Id. at 3.

As building manager for the Hotel, London "work[ed] closely with [DHS]" and "even had to take a ten-hour training course when [DHS] wanted to implement a new software program system called 'CARES.'"  Sept. 2013 Letter at 1; see also Opp. 4 (providing additional information about the "CARES" system).  London asserts that, until the events in question, he "always had an excellent work relationship with DHS."  See May 13, 2013 Notarized Jae London Letter (annexed to Compl.) ("May 2013 Letter"), at 13.  Indeed, under London's tenure as hotel manager, DHS's inspection scores for the Hotel improved from 53% to 82%.  See Jan. 2013 Letter at 6.

On January 10, 2013, Sony Williams, who was employed by DHS as a program administrator, performed an inspection of the Hotel in which she "conducted a walk-thru on each floor inspecting five units from each floor, hallways, bathrooms, etc."[6]  See January 10, 2013 Email (annexed to Compl.) ("Jan. 2013 Email"), at 21.  After completing the inspection, Williams asked London about the building's closed circuit security cameras, to which London responded that they were currently "out for repairs."  Jan. 2013 Letter at 5; see also Jan. 2013 Email at 21.  According to London, Williams then began to curse and threaten London because she believed that London was "being untruthful with her."  Jan. 2013 Letter at 5.  London explained to Williams that if she was not satisfied with his answer, she would have to take up the issue "with the building owner Alan Lapes."[7]  Id.  William also yelled at London about not

---

[6] In one of his letters submitted in opposition to the motion to dismiss, London notes that he had a prior run-in with Williams on January 3, 2012, when Williams visited the Hotel to investigate a client's complaint that there was no heat or water.  See Opp. 1 at 5.  Williams then sent London an email stating that "[i]f there is no heat and hot water in your facility this must be reported to me immediately."  Id. at 7.

[7] London later explained that, at that time, he told Williams, "there is some information that I'm privilege [sic] to that I'm not allowed to say and I did not want to speak on my bosses

keeping sufficient records of the Hotel's guests in the Visitors Log Book.  Id. at 6.  Another DHS employee named Joyce Williams was present during this meeting and was a "willing participant" in the verbal "attack" on London.  Id.  In London's words, "I felt like I was being badgered, targeted and harassed.  As embarrassing as it may sound, I felt as if I was being hazed by women based on my gender.  I say this because I didn't give either Sonya or Joyce ammunition to attack me in that manner."  Id.  Additionally, London asserts, "[d]uring our meeting (myself being the only male in the room) there was a strong presence of male-bashing towards me coming from Sonya Williams."  Sept. 2013 Letter at 1.

Following this confrontation, London sent a letter to Sonya Williams's supervisor, Fran Winter, in which he complained of Williams's "improper behavior" and "specifically stated that [he] was being bullied harassed and threatened by [Williams]."  Id.; see Jan. 2013 Letter. London also changed his off-day to Thursday to avoid any further confrontation with Williams. See Sept. 2013 Letter at 1.  Soon thereafter, London received a call from his employer, Lapes, during which Lapes "instruct[ed] [London] to apologize to Ms. Williams because [his] complaint letter was bad for business . . . [and] also stated that if Ms. Williams [didn't] feel comfortable with [London] continuing as building manager that [his] position would be terminated."  Feb. 2013 Letter at 9.  Then, on January 18, 2013, Williams unexpectedly returned to the Hotel and told London that she had read his complaint letter and insinuated that because she was friends with London's employer, Lapes, that she could convince him to fire London.  See Sept. 2013 Letter at 1; May 2013 Letter at 12.  London claims, "[s]he went on to say that I should be terminated because I failed to follow DHS chain-of-command (although I'm not employed by

_____

[sic] behalf."  Opp. 1 at 8.  According to London, "[Williams] knew very well that she needed to address Alan Lapes with those types of concerns."  Id.

DHS) and that my complaint letter was emotional." May 2013 Letter at 12. The following

Monday, on January 21, 2013, Lapes told London that he was being fired because of the

complaint letter and because Williams did not "wish for [London] to continue as building

manager." Id. at 13. London believes that Williams "conspired with [his] employer [Lapes] to

fire [him] . . . [n]ot because [he] was negligent as a building manager but because [he] wrote a

complaint of harassment." Feb. 2013 Letter at 10.

On February 25, 2013, after having been terminated, London appears to have filed a

complaint with DHS concerning Sonya Williams's behavior. See DHS Complaint (annexed to

Compl.), at 14-15. On March 8, 2013, London received a response from DHS employee Iris

Rodriguez in which she apologized for Williams's unprofessional conduct. See Rodriguez

Email (annexed to Compl.) ("Rodriguez Email"), at 16. Rodriguez wrote:

> I met with Ms. Williams to inquire why such language was utilized and she expressed
> that she had gone out to the Washington Hotel to follow up on a 311 inquiry. Upon her
> arrival she discovered the situation was still prevalent and that you stated it had just
> happen[ed], at which time she stated to you "Do Not Bullshit me". In return you
> informed her that you couldn't inform her of everything that happened at this facility
> because your Boss did not want you to do so. The conversation went on for a few more
> minutes and then she departed without any further incidents. This was the last time she
> addressed any issues with you as the next thing she knew you [were] terminated.
>
> As for Ms. Williams having anything to do with your termination[,] I can assure you she
> does not have the power or authority to do so. I advise you to please try to speak to your
> former Boss to get the real answer as to your termination. DHS does not have the
> authority to fire any hotel staff, as you folks do not work for us directly.

Id. London now asserts, "[a]s a result of this strenuous incident I've suffered from a nervous

breakdown which caused me to seek help form a Life Coach (Psychiatrist). In addition, I am

currently in the process of being evicted from my home." Compl. at 3.

B.    Procedural History

London filed a pro se complaint against DHS and Williams on September 20, 2013,

asserting "Discrimination & Retaliation" as the basis for federal subject matter jurisdiction. See

Compl. at 2. On March 3, 2014, defendants filed the instant motion to dismiss.[8] See

Defendants' Notice of Motion to Dismiss or, in the Alternative, for Summary Judgment, filed

Mar. 3, 2014 (Docket # 20); Declaration of Kara Mace, filed Mar. 3, 2014 (Docket # 21) ("Mace

Decl."); Memorandum of Law in Support of Defendants' Motion to Dismiss the Complaint, or in

the Alternative, for Summary Judgment, filed Mar. 3, 2014 (Docket # 22) ("Def. Mem."); Notice

to Pro Se Litigant Who Opposes a Rule 12 Motion Supported by Matters Outside the Pleadings,

filed Mar. 3, 2014 (Docket # 23); Reply Memorandum of Law in Further Support of Defendants'

Motion to Dismiss the Complaint, or in the Alternative, for Summary Judgment, filed Apr. 25,

2014 (Docket # 26) ("Def. Reply"). In response to defendants' motion, London has sent the

Court four letters. See Opp. 1; Opp. 2; Opp. 3; Opp. 4.

## II.   LAW GOVERNING MOTIONS TO DISMISS

A party may move to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) where

the opposing party's pleading "fail[s] to state a claim upon which relief can be granted." Fed. R.

Civ. P. 12(b)(6). While a court must accept as true all of the allegations contained in a

complaint, that principle does not apply to legal conclusions. See Ashcroft v. Iqbal, 556 U.S.

662, 678 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) ("[A] plaintiff's

obligation to provide the grounds of his entitlement to relief requires more than labels and

---

[8] In support of their motion to dismiss, defendants have proffered as evidence a
declaration by attorney Kara Mace. See Mace Decl. Where materials outside the pleadings are
presented on a motion to dismiss under Rule 12(b)(6), a court "must either exclude the additional
material and decide the motion on the complaint alone or convert the motion to one for summary
judgment under Fed. R. Civ. P. 56 and afford all parties the opportunity to present supporting
material." Friedl v. City of New York, 210 F.3d 79, 83 (2d Cir. 2000) (citations and internal
quotation marks omitted). Here, the Court chooses to exclude this declaration based on
defendants' failure to file a Rule 56.1 Statement. See supra note 2.

conclusions, and a formulaic recitation of the elements of a cause of action will not do.")
(citation, internal quotation marks, and brackets omitted).  In other words, "[t]hreadbare recitals
of the elements of a cause of action, supported by mere conclusory statements, do not suffice,"
Iqbal, 556 U.S. at 678, and thus a court's first task is to disregard any conclusory statements in a
complaint, id. at 679.

      Next, a court must determine if a complaint contains "sufficient factual matter" which, if
accepted as true, states a claim that is "plausible on its face."  Id. at 678 (citation and internal
quotation marks omitted); accord Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117,
121 (2d Cir. 2007) ("[A] complaint must allege facts that are not merely consistent with the
conclusion that the defendant violated the law, but which actively and plausibly suggest that
conclusion.").  "A claim has facial plausibility when the plaintiff pleads factual content that
allows the court to draw the reasonable inference that the defendant is liable for the misconduct
alleged.  The plausibility standard is not akin to a probability requirement, but it asks for more
than a sheer possibility that a defendant has acted unlawfully."  Iqbal, 556 U.S. at 678 (citations
and internal quotation marks omitted).  "[W]here the well-pleaded facts do not permit the court
to infer more than the mere possibility of misconduct," a complaint is insufficient under Fed. R.
Civ. P. 8(a) because it has merely "alleged" but not "'show[n]' – 'that the pleader is entitled to
relief.'"  Id. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

      In the case of pro se plaintiffs, "[a] document filed pro se is to be liberally construed, and
a pro se complaint, however inartfully pleaded, must be held to less stringent standards than
formal pleadings drafted by lawyers."  Erickson v. Pardus, 551 U.S. 89, 94 (2007) (citations and
internal quotation marks omitted); accord McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir.
1999) (a pro se party's pleadings should be construed liberally and interpreted "'to raise the

strongest arguments that they suggest'") (quoting Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir.

1994)).  However, even pro se pleadings must contain factual allegations that "'raise a right to

relief above the speculative level.'"  Dawkins v. Gonyea, 646 F. Supp. 2d 594, 603 (S.D.N.Y.

2009) (quoting Twombly, 550 U.S. at 555).

III.    DISCUSSION

The Court liberally construes London's complaint as raising claims under Title VII for

discrimination, hostile work environment, and retaliation.  See generally Compl. at 1-4.

Defendants argue that the complaint should be dismissed for a number of reasons.  We reach

only one of these arguments as it is sufficient on its own to dispose of this case: that London's

allegations fail to show that either defendant was his employer.  See Def. Mem. at 6-7; Def.

Reply at 3-4.

Under Title VII, it is an "unlawful employment practice for an employer . . . to fail or

refuse to hire or to discharge any individual, or otherwise to discriminate against any individual

with respect to his compensation, terms, conditions, or privileges of employment, because of

such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Thus,

to proceed with his Title VII claims, London must establish that an employer-employee

relationship existed between himself and defendants.  See Salamon v. Our Lady of Victory

Hosp., 514 F.3d 217, 226 (2d Cir. 2008); Gulino v. N.Y.S. Educ. Dep't, 460 F.3d 361, 370 (2d

Cir. 2006) ("[T]he existence of an employer-employee relationship is a primary element of Title

VII claims.") (citing cases); St. Jean v. Orient-Express Hotels Inc., 963 F. Supp. 2d 301, 306

(S.D.N.Y. 2013) ("Title VII prohibits discriminatory employment practices by an 'employer.'").

In order to show that an employment relationship exists, the plaintiff must first "show [he] was

hired by the putative employer" by "furnish[ing] proof that [his] putative employer remunerated

9

[him] for services [he] performed." <u>United States v. City of New York</u>, 359 F.3d 83, 91-92 (2d

Cir. 2004); <u>see also</u> <u>Gulino</u>, 460 F.3d at 372 ("In determining whether a person has been hired,

we look primarily to whether a plaintiff has received direct or indirect remuneration from the

alleged employer.") (internal punctuation and citation omitted).[9]

     Here, the complaint contains no allegations that plausibly show that London had an

employment relationship with defendants. While London states in one of his opposition letters

that he was "working under and taking orders" from DHS, <u>see</u> Opp. 3 at 1, he elsewhere makes

clear that he was "not employed by DHS," Feb. 2013 Letter at 9; May 2013 Letter at 12; <u>see also</u>

Rodriguez Email at 16. In other documents attached to the complaint, London explicitly states

that he was employed by the Washington Hotel and its owner Alan Lapes. <u>See</u> Sept. 2013 Letter

at 1 ("I was employed at the Washington Hotel."); May 2013 Letter at 12 (referring to Alan

Lapes as his "employer"); Feb. 2013 Letter at 9 (Lapes was his "employer" and "boss").

Moreover, because there is no indication in the complaint that London actually received

---

    [9] "Once plaintiff furnishes proof that [his] putative employer remunerated [him] for
services [he] performed, we look to the thirteen factors articulated by the Supreme Court in
<u>Community for Creative Non-Violence v. Reid</u>, 490 U.S. 730, [ ](1989) to determine whether an
employment relationship exists." <u>City of New York</u>, 359 F.3d at 92 (internal quotation marks
and citation omitted). The factors are:

> the hiring party's right to control the manner and means by which the product is
> accomplished[;] the skill required; the sources of the instrumentalities and tools; the
> location of the work; the duration of the relationship between the parties; whether the
> hiring party has the right to assign additional projects to the hired party; the extent of the
> hired party's discretion over when and how long to work; the method of payment; the
> hired party's role in hiring and paying assistants; whether the work is part of the regular
> business of the hiring party; whether the hiring party is in business; the provision of
> employee benefits; and the tax treatment of the hired party.

<u>Id.</u> (quoting <u>Reid</u>, 490 U.S. at 751-52).

remuneration from defendants, London has not shown that either defendant was London's

employer.  See Gulino, 460 F.3d at 372 ("Where no financial benefit is obtained by the

purported employee from the employer, no plausible employment relationship of any sort can be

said to exist.") (quoting O'Connor v. Davis, 126 F.3d 112, 115-16 (2d Cir. 1997)); House v.

Wackenhut Servs., Inc., 2012 WL 4017334, at *9 (S.D.N.Y. Aug. 20, 2012) ("[P]laintiff is not

an 'employee' of the [defendant] because the [defendant] did not hire or provide remuneration to

plaintiff."); Rolls v. Pa. Hotel, 2006 WL 2463545, at *4 (S.D.N.Y. Aug. 17, 2006) (dismissing

Title VII claim against a defendant because the plaintiff did "not allege that he was employed by

[the defendant] . . . nor that he received any remuneration from [the defendant]").

        Nor can an employment relationship can be imputed to defendants based on the "joint

employer" doctrine.  Under this doctrine, "an employee, formally employed by one entity, who

has been assigned to work in circumstances that justify the conclusion that the employee is at the

same time constructively employed by another entity, may impose liability for violations of

employment law on the constructive employer, on the theory that this other entity is the

employee's joint employer."  Arculeo v. On-Site Sales & Mktg, LLC, 425 F.3d 193, 198 (2d Cir.

2005) (citations omitted).  In applying the joint employer doctrine, courts have asked whether

"there is sufficient evidence that the defendant had immediate control over the formal

employer's employees" and have considered factors such as "commonality of hiring, firing,

discipline, pay, insurance, records, and supervision."  St. Jean, 963 F. Supp. 2d at 308 (S.D.N.Y.

2013) (quoting Dupree v. Urban Homesteading Assistance Bd. Sterling St. Hous. Dev. Fund

Corp., 2011 WL 1343163, at *6 (E.D.N.Y. Apr. 8, 2011)); accord Shiflett v. Scores Holding Co.,

Inc., 2014 WL 1413618, at *3 (S.D.N.Y. Apr. 10, 2014) ("As a functional matter, courts

consider the control that the joint employers exercise over the employee in setting the terms and

11

conditions of that employee's work.") (internal quotation marks and citation omitted).

Nothing in the complaint plausibly alleges that these factors point towards defendants being London's "joint employer."  To the contrary, the complaint alleges that London reported only to the owner of the Hotel, Lapes, and not to any DHS employees.  For example, in one of the documents accompanying the complaint, London notes that he had told Williams that the security camera issue had "to be taken up with the building owner Alan Lapes."  Jan. 2013 Letter at 5.  In the same document, London asserts, "[t]he purpose of [DHS's] visit was to make an evaluation of the Washington, prepare a report for the [DHS] so that Alan Lapes may address any issue."  Id. at 6-7.  London consistently states throughout the complaint that it was Lapes, and not DHS or Williams, who fired him.  See Feb. 2013 Letter at 9-10; May 2013 Letter at 12-13.  Although London claims on several occasions that Williams convinced Lapes to fire him, he essentially admits that Lapes fired him out of a concern for his business and not because DHS had any direct control over him.  See May 2013 Letter at 12 ("I received a phone call from my employer instructing me to apologize to Ms. Williams because my complaint letter was bad for business . . . . He instructed me to apologize to her so that she can cool down and also, so that he can keep me at the Washington Hotel.").

The complaint alleges that London had been required to take a DHS software training course, see Sept. 2013 Letter at 1, and that he was asked to directly notify DHS employees if certain issues arose at the Hotel, see, e.g., January 3, 2013 Williams Email (annexed to Compl.), at 19.  But these factual details fall short of plausibly suggesting that DHS exercised control over London.  Rather, they merely support the allegations throughout the complaint that the Hotel and DHS had a business relationship under which it was advantageous for the Hotel and DHS employees to work together to ensure that the hotel rooms satisfied certain quality standards.  In

the end, because London has not asserted any factual allegation in his complaint establishing that

DHS or Williams had any authority to fire, supervise, or punish him, the joint employer

exception does not apply in these circumstances.

Because London has not brought his civil rights claims against an "employer," as

required by Title VII, his complaint should be dismissed.[10]

## IV.   CONCLUSION

For the foregoing reasons, the motion to dismiss London's complaint should be granted.[11]

### PROCEDURE FOR FILING OBJECTIONS TO THIS
### REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil

Procedure, the parties have fourteen (14) days including weekends and holidays from service of

this Report and Recommendation to serve and file any objections.  See also Fed. R. Civ. P. 6(a),

(b), (d).  Such objections (and any responses to objections) shall be filed with the Clerk of the

Court, with copies sent to the Hon. Paul Crotty.  Any request for an extension of time to file

objections must be directed to Judge Crotty.  If a party fails to file timely objections, that party

---

[10] Additionally, all claims against Williams must be dismissed for the separate reason that individuals may not be held liable under Title VII.  See Spiegel v. Schulmann, 604 F.3d 72, 79 (2d Cir. 2010) ("We have, however, determined that the remedial provisions of Title VII . . . do not provide for individual liability.") (citing cases).

[11] Leave to replead should not be granted inasmuch as the defects in the complaint are not grounded in inartful pleading but rather are so fundamental that repleading would be "futile." O'Hara v. Weeks Marine, Inc., 294 F.3d 55, 69 (2d Cir. 2002).  London set forth his version of the facts in the original complaint and attachments in great detail and submitted four letters providing additional details in response to defendants' motion to dismiss.  Thus, granting leave to replead would constitute a sixth opportunity for London to set forth a factual narrative and would inevitably "invite [London] to offer a new narrative, not to furnish details that could salvage the original one."  Blanton v. City of New York, 2012 WL 6634177, at *5 (S.D.N.Y. Dec. 20, 2012) (quoting Hill v. Philip Morris USA, 2004 WL 1065548, at *7 (S.D.N.Y. May 11, 2004) (internal bracketing and quotation marks omitted)).

will not be permitted to raise any objections to this Report and Recommendation on appeal. See

Thomas v. Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis,

Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010).

Dated: July 29, 2014
      New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

14